IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PATRICK E. MARTIN,

                  Plaintiff,

       v.                                  CASE NO. 25-3049-JWL

DAN SCHNURR, et al.,

                  Defendants.

## MEMORANDUM AND ORDER

This matter is a pro se civil rights action filed under 42 U.S.C. § 1983. Plaintiff alleges that the defendants violated his constitutional rights by failing to protect him from attack by another inmate at the Hutchinson Correctional Facility ("HCF") in Hutchinson, Kansa.

After ordering, receiving, and reviewing a *Martinez* Report (Doc. 10) in this case, the Court entered a memorandum and order to show cause ("MOSC") (Doc. 17) directing Plaintiff to show cause why this matter should not be dismissed for failure to state a claim on which relief can be granted. This matter is before the Court on Plaintiff's Responses (Docs. 20, 21, 22 and 23) to the *Martinez* Report and the MOSC.

## I.  Nature of the Matter Before the Court

Plaintiff's amended complaint ("AC") (Doc. 8) alleges HCF officials failed to protect him from attack by another inmate. Plaintiff states he was attacked by inmate Dawson Slater on March 26, 2023, at approximately 6:05 a.m. *Id*. at 3. Slater stabbed him 16 times in his upper body, left shoulder, and right leg. *Id*. The AC describes the attack as unprovoked. *Id*. at 6. According to Plaintiff, Slater had stabbed two other inmates on two separate occasions within two months prior

1

to his attack on Plaintiff.  *Id*. at 3.  Slater was released back into the general population after each of the prior incidents.  *Id*. at 3, 5.

In Plaintiff's original complaint (Doc. 1), which was not on the court-approved form, Plaintiff includes more factual allegations.  Plaintiff states that he was exiting the dining hall after having eaten breakfast when the attack occurred.  (Doc. 1, at 3.)  He asserts that he and Slater had "no prior associations, affiliations or dealings with one another before Plaintiff was attacked."  *Id*.  Plaintiff was taken to the hospital where his wounds were stitched and glued closed.  *Id*.  He was returned to HCF later that day and remained in the infirmary for an additional three days.  *Id*.

Plaintiff asserts that the defendants failed to classify Slater as Other Security Risk or Continuous Bad Behavior pursuant to KDOC policy, which could have protected Plaintiff from being Slater's next victim.  *Id*. at 4.   Plaintiff states that Warden Schnurr is responsible for the placement of inmates in long-term restrictive housing if the inmate has shown consistent bad behavior or behavior which has threatened the maintenance, security, or control of HCF.  *Id*. at 5.  He further alleges that Defendants Bell and Allen are members of the HCF Restrictive Housing Review Board, which is responsible for reviewing the status of inmates in restrictive housing and retaining them, returning them to general population, or recommending they be transferred.  *Id*.  The Board's recommendation must then be approved by Schnurr or Kroeker.  *Id*.  Plaintiff therefore alleges that each defendant "either recommended or approved inmate Dawson Slater's removal from Administrative Restrictive Housing after his violent attacks (stabbings) of two other residents prior to his vicious attack on the plaintiff."  *Id.*

The AC brings one count for deliberate indifference in violation of the Eighth Amendment. *Id*. at 6.  Plaintiff names the following defendants: Dan Schnurr, Warden of HCF; Misty Kroeker, Deputy Warden; Elizabeth Allen, EAI SAS; and Jeremy Bell, Major/Chief of Security.  The

Complaint seeks relief in the form of compensatory damages of $300,000 from each defendant and punitive damages of $100,000 from each defendant.

## II.  The *Martinez* Report

The Report largely agrees with Plaintiff's description of the attack by Slater.  However, the Report does not confirm Plaintiff's allegations about Slater's history or the HCF personnel responsible for deciding on Slater's security status.

According to the Report, Slater was part of a fight on December 4, 2022, involving multiple inmates.  (Doc. 10, at 8.)  The disciplinary report with the same date states that Slater "was involved in a[n] attack on Inmate Adkins.  Inmate did have a home made stabbing device."  (Doc. 10-14, at 1.)  Slater was sentenced to serve about two weeks of disciplinary segregation.  *Id.*  Slater was then released from segregation.  Because he was serving a disciplinary sentence, he did not appear before the Segregation Review Board, as Plaintiff claims.  *Id.*

On March 6, 2023, Slater was found with a weapon hidden in his cell.  *Id.*  He was sentenced to five days of disciplinary segregation and 30 days restriction.  *Id.*  Again, he did not appear before the Segregation Review Board but was released from segregation as a matter of course after serving his sentence.  *Id.*

While Plaintiff claims that Slater had attacked other inmates twice in the two months before he stabbed Plaintiff, the Report only mentions the December 4, 2022, fight.  However, Slater's disciplinary record does show six (6) other instances of battery or fighting at HCF prior to the attack on Plaintiff.  (Doc. 10-3, at 3-4.)  These are not discussed in the Report.  The Report asserts that nothing about Slater's previous disciplinary offenses "raised any concern that would have caused the board to consider whether to look more closely at whether to hold Slater in a longer period of administrative segregation" after serving his disciplinary segregation term.  *Id.* at 8-9.

3

The Report further argues that the attack on Plaintiff was different from Slater's other offenses, which had been within "what sometimes happens in a prison." *Id*. at 9.  Since the attack on Plaintiff, Slater has been held in long term segregation upon the recommendation of the head of classifications at the Hutchinson Correctional Facility and the approval of the senior classifications official at the KDOC Central Office. *Id.*

The Report states that after the attack, Plaintiff disclosed that he was wrongly believed to have provided information to convict another inmate. *Id*.; Doc. 10-29, at 5.  Investigation determined that Michael Gaston, known leader of a white supremacist security threat group ("STG") at HCF, was contacted by Scott Cheever, suspected STG member housed at Lansing Correctional Facility, to call a hit on Martin for his cooperation with law enforcement during Cheever's prosecution. (Doc. 10-29, at 1.)  With this information, Slater was validated as an STG member. *Id*.  Slater's STG status combined with the violence of the attack on Plaintiff resulted in his placement in long term segregation. *Id.*  According to the Report, both Slater and Plaintiff had been suspected of being STG members and were investigated in 2018 (Plaintiff) and 2020 (Slater), but neither was validated at that time. *Id.*

The Report also mentions that Plaintiff was attacked a second time, again because he was accused of informing on a different inmate. *Id*.; Doc. 10-28, at 1.  He was then transferred to Ellsworth Correctional Facility. *Id.*

According to the Report, Warden Schnurr, Deputy Warden Kroeker, and Investigator Allan were not involved in any decisions regarding Slater's segregation status. *Id.* at 10-11; Affidavit of Dan Schnurr, Doc. 10-4, at 1; Affidavit of Misti Kroeker, Doc. 10-5, at 1; Affidavit of Elizabeth Aragon (formerly Allan), Doc. 10-7, at 1.

The Report also asserts that Plaintiff did not exhaust his administrative remedies before filing this lawsuit.  On May 5, 2024, Plaintiff gave a Form 9 to his unit team based on the March 26, 2023, attack and noted it was an "informal resolution."  *Id.* at 5.  On the Form 9, Plaintiff asked for $50,000 and other remedies not available through the grievance process.  *Id.*; Doc. 10-9, at 3. The Form 9 was sent to legal counsel for HCF on May 7, 2024.  Counsel responded to Plaintiff the same day, saying a claim for money must be made through the claims process rather than the grievance process.  *Id.* Counsel explained that a personal injury or property claim had to be filed within 10 days of the occurrence of the event and referred Plaintiff to his inmate rule book.  The letter concluded by denying Plaintiff's claim because he used the incorrect procedure and was late in doing so.  *Id.* at 6.

Plaintiff then filed a second claim dated May 12, 2024, for $50,000.  *Id.*  Plaintiff states in on the claim form that he tried on three prior occasions to file a claim while at HCF but the paperwork was "lost," and he "was made to feel intimidated into not pursing this matter."  (Doc. 10-8, at 7.)  According to documents attached to Plaintiff's AC, this second claim was denied on August 5, 2024, as being late and exceeding the reimbursement limit.  *Id.*; Doc. 10-9, at 5.  Plaintiff did not appeal the denial of this claim.  *Id.* at 7.

Another document attached to the AC is a grievance dated May 20, 2024, based on the attack.  *Id.*  The Report states that "[t]here is no indication that it was ever received by staff and answered or processed" and was never appealed.  *Id.*

## III.  Discussion

### A.  Exhaustion of Administrative Remedies

The Report states that Plaintiff has not exhausted his administrative remedies with respect to the subject matter of the claims he makes in the AC.  An inmate is required by the Prison

Litigation Reform Act ("PLRA") to exhaust all available prison administrative remedies before filing a complaint in federal court. Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (stating that under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court") (citations omitted). "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 219 (2007) (stating that "the benefits of exhaustion include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record") (citations omitted).

This exhaustion requirement "is mandatory, and the district court [is] not authorized to dispense with it." *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1167 n. 5 (10th Cir. 2003), *cert. denied*, 540 U.S. 1118 (2004); *Little*, 607 F.3d at 1249; *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (quoting *Jones*, 549 U.S. at 211)). An inmate exhausts by complying with "an agency's deadlines and other critical procedural rules." *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). A prison or prison system's regulations define the steps a prisoner must take to properly exhaust administrative remedies and a prisoner "may only exhaust by properly following all of the steps laid out" therein. *Little*, 607 F.3d at 1249 (citing

*Woodford*, 548 U.S. at 90).  "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted).  "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

In a suit governed by the PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).  The issue of Plaintiff's failure to exhaust his available administrative remedies before filing his lawsuit must be determined before reaching the merits of his lawsuit.  *Little*, 607 F.3d at 1249 ("unexhausted claims cannot be brought in court") (citation omitted); *see also Jernigan*, 304 F.3d at 1032 (an inmate who does not complete the grievance process is barred from pursuing a §1983 claim).

For Kansas state prisoners, the administrative remedies require the inmate to seek an informal resolution with personnel who work with the inmate on a daily basis.  K.A.R. § 44–15–101(b).  If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections.  K.A.R. § 44–15–101(d).  The procedure to follow at each level is described in detail in Kan. Admin. Regs.  § 44–15–102; *see also Garza v. Correct Care Solutions*, 2011 WL 2580299, at *2 (D. Kan. 2011), *aff'd* 451 F. App'x 775 (10th Cir.) (granting summary judgment for failure to exhaust claims against Correct Care Solutions where plaintiff failed to allege that he sought relief on his claims first through his unit team, then the warden, and finally from the Secretary of Corrections).

7

This Court has held that:

> The regulations do not provide for exhaustion "by default" if the informal resolution is unsuccessful. If an inmate does not receive a response to a grievance, they "may move to the next stage of the grievance procedure if a timely response is not received at any step in the grievance process." K.A.R. 44-15-101b. "If an inmate does not receive a response from the unit team within 10 calendar days, a grievance report may be sent to the warden without the unit team signature or signatures." K.A.R. 44-15-102(a)(2).

*Clay v. Esparza*, 2020 WL 6117856, at *4 (D. Kan. 2020).

In *Kidd v. Baker*, the plaintiff alleged that he filed emergency grievances. *Kidd v. Baker*, 2022 WL 17485932, at *6 (D. Kan. 2022). The Court concluded that the plaintiff failed to exhaust his administrative remedies, stating that "[w]hile he sent letters or 'petitions' to the Secretary of Corrections, he did not follow the established procedure." *Id.* "Simply presenting a defective or non-complying grievance . . . does not constitute exhaustion of remedies." *Id.* (quoting *Brewer v. Mullin*, 130 F. App'x 264, 265 (10th Cir. 2005)).

As this Court has previously found, there are two distinct avenues of administrative exhaustion established in Kansas law:

> The first avenue is found in the regulations codified by Article 15 of chapter 44 of the Kansas Administrative Regulations. These regulations govern inmate grievances covering "a broad range of matters that directly affect the inmate, including" complaints about policies and conditions of imprisonment, actions of employees and other inmates, and incidents occurring within the facility. Kan. Admin. Regs. § 44–15–101a(d)(1)(A)–(B). As the Court previously determined, this regulation applies to a constitutional claim such as the one asserted here, where the conduct complained of stems from "actions by employees" of the prison facility. *Id.* § 44–15–101a(d)(1)(B).

*Lewis v. Carrell*, 2015 WL 413640, at *2–3 (D. Kan. 2015). "The second avenue is governed by the regulations in Article 16 of chapter 44 of the Kansas Administrative Regulations." *Id.* at *3. Kan. Admin. Regs. § 44–16–104a applies to claims for personal injury and provides: "(a) Each

inmate claim for personal injury shall be submitted to the [prison] facility and [the] secretary of corrections within 10 calendar days of the claimed personal injury." *Id*. (citing Kan. Admin. Regs. § 44–16–104a).

The Kansas Court of Appeals has explained that the two sets of regulations found in Articles 15 and 16 are "separate and distinct" from one another. *Id*. (citing *Redford v. Kan. ex rel. Dep't of Corr.*, 295 P.3d 1054, 2013 WL 781102, at *6 (Kan. Ct. App. Mar. 1, 2013 (unpublished table decision)). Indeed, the regulation "expressly provides: 'The grievance procedure [in article 15] shall not be used in any way as a substitute for, or as part of, the . . . property loss or personal injury claims procedure [in Article 16] . . .'" *Id*. (quoting Kan. Admin. Regs. § 44–15–101a(d)(2); *see also Sharrock v. Stephens*, 2011 WL 5526444, at *1 (D. Kan. 2011) ("Importantly, the requirements in [§ 44–16–104a] apply regardless of whether the inmate pursues a grievance pursuant to § 44–15–101.").

The Court in *Conley* addressed defendants' argument that plaintiff failed to file a personal injury claim in a § 1983 case, and noted that while case law establishes that exhaustion of Article 15's procedures alone is not sufficient for a plaintiff to assert a personal injury claim, the Court "had not located any authority requiring an inmate to exhaust both the requirements of Article 15 and Article 16 before asserting a § 1983 claim based on an alleged violation of an inmate's constitutional rights" and declined to invent such a requirement. *Conley v. Pryor*, 2015 WL 413638, at *14 (D. Kan. 2015). However, the Court did find that exhaustion under § 44–15–101 was necessary for plaintiff's § 1983 claim. *Id*. The Court found that where plaintiff asserted a § 1983 claim for failure to provide proper dental care, plaintiff's claim constituted a complaint about the conditions of his imprisonment and the actions of employees, which requires exhaustion under Kan. Admin. Regs. § 44–15–101. *Id*. Likewise, the Court in *Nunez*, stated that "an inmate

who wishes to pursue both a personal injury claim and a § 1983 claim must comply with two distinct sets of administrative procedures even if he bases his claims on a single act." *Nunez v. Heimgartner*, 2017 WL 2264466, at *5 (D. Kan. 2017) (citation omitted).  The Court held that "Article 15 of the KDOC regulations covers the administrative procedures that must proceed a § 1983 claim."  *Id.* at *6 (citation omitted); *see also Jones v. Parks*, No. 19-cv-3175-HLT-GEB, Doc. 50 at n.3 (D. Kan. April 13, 2021) ("Plaintiff's alleged personal injury claims based off the same incidents does not exhaust his § 1983 claim.").

The Tenth Circuit has upheld the requirement that a plaintiff must comply with the requirements of § 44-15-101 prior to filing a § 1983 case, regardless of an attempt to comply with the requirements of § 44-16-104a.  *See Lynn v. Kelly*, 2022 WL 1043752, at *1 (10th Cir. 2022) (unpublished) ("Mr. Lynn may have attempted to comply with the distinct requirements of § 44-16-104a, but he wholly ignored the requirements of § 44-15-101. . . . As Mr. Lynn failed to comply with the established grievance process, summary judgment was proper."); *Kidd v. Baker*, 2022 WL 17485932, at *5–6 (D. Kan. 2022) (describing the dual-track system of administrative exhaustion set out in Kansas law), *affirmed* 2023 WL 2396530 (10th Cir. 2023).

The Tenth Circuit has explained:

> [T]he initial burden of proof for the exhaustion of administrative remedies in a suit governed by the PLRA "lies with the defendant." If the defendant carries this burden, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact." A plaintiff's failure to meet this burden results in the affirmative defense barring his claim and entitles the defendant to summary judgment as a matter of law.

*Moore v. Tresch*, 2022 WL 612796, at *2 (10th Cir. Mar. 2, 2022) (unpublished) (internal citations omitted).  Courts in this district have found that a defendant satisfies the initial burden to show that a plaintiff failed to exhaust administrative remedies where the defendant provides a KDOC records

custodian affidavit that explains that they reviewed the grievance records and found evidence that a plaintiff availed himself of the grievance process but did not complete it. *See Lewis v. Carrell*, 2014 WL 4450147, at *10 (D. Kan. 2014) (citation omitted).

The Report in this case satisfies the initial burden with this type of evidence. However, Plaintiff has made allegations that indicate perhaps he attempted to exhaust. The exhaustion requirement extends only to the exhaustion of "available" remedies. *See Ross v. Blake*, 578 U.S. 632, 641–43 (2016). An administrative procedure may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "[I]nterference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* (citations omitted).

Based on the Report, the Court found that Plaintiff failed to exhaust his administrative remedies before filing this action. Plaintiff initiated an attempt to comply with the requirements of § 44-16-104a more than a year after the attack. He also may have begun the grievance process under § 44-15-101 but apparently did not follow through with either the personal injury or grievance process.

In response, Plaintiff argues that his grievance was obstructed and the grievance process was effectively unavailable to him. (Doc. 21, at 2.) He alleges that he submitted a first Form 9 (his attempt at informal resolution) on April 5, 2023. He says that he asked about it a couple days later and was told they were still looking into it. Plaintiff alleges that he submitted a formal grievance on April 17, 2023. He claims that he was later called in and told he had to sign a protective custody waiver or he would be taken to the Restricted Housing Unit ("RHU"), losing his prison industry job and all privileges. He signed the waiver. His cell was then searched and

all of his documents were confiscated.  Plaintiff states that he filed another Form 9 for the search.

He heard nothing.  When he asked about his grievance, he was told it was being looked into.

Plaintiff further argues that grievance process not available due to (1) his injuries and (2)

HCF officials' "failure to advise or assist in initiating a personal injury claim.  (Doc. 22, at 1.)

Plaintiff states that he was under "medical supervision" for about five days after the attack, and

"[a]t no time did Plaintiff's Unit Team staff member visit or inquire whether Plaintiff wished to

file a grievance or personal injury claim or provide the necessary forms."  *Id.* at 2.  He argues that

HCF's own conduct caused Plaintiff to miss the deadline: "failing to advise, failing to provide

forms, failing to transfer Plaintiff right away causing Plaintiff to be assaulted again days later

thereby refusing access to forms and law library, failure in downgrading serious violent incidents

and possessing the required evidence needed."  *Id.*

Because there are contradictory factual allegations, the AC is not dismissed upon screening

for failure to exhaust administrative remedies.

### B.  Failure to Protect

As explained in the MOSC, while prison officials have a duty to ensure the safety and

protection of inmates, not every injury an inmate suffers results in prison officials being liable.

*Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) (internal quotation marks and citations omitted).

An official must have acted with deliberate indifference to be held liable for violating an inmate's

Eighth Amendment rights.  *Id.* at 834.  Deliberate indifference exists when an official "knows of

and disregards an excessive risk to inmate health or safety."  *Id.* at 837 ("[T]the official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference.").

"[S]ubjective awareness of only *some* risk of harm to a prisoner is insufficient for a

deliberate-indifference claim." *Turner v. Okla. Cty. Bd. of Cty. Comm'rs*, 804 F. App'x 921, 926 (10th Cir. 2020) (unpublished) (citing *Marbury*, 936 F.3d at 1238).  Rather, "officials must possess enough details about a threat to enable them to conclude that it presents a strong likelihood of injury, not a mere possibility." *Id.* (citing *Marbury*, 936 at 1236 (internal quotation marks omitted)).

The Report and exhibits show that Slater had a history of violence against other inmates but not that he had stabbed two other inmates within two months of the attack on Plaintiff, as Plaintiff alleged in the AC.  Neither Plaintiff nor the Report alleges that officials had any knowledge that Slater and Plaintiff had previous problems or that Plaintiff was at any heightened risk.  While Plaintiff, and every other inmate, may have been at *some* risk from Slater, there is no evidence that officials should have concluded that Slater presented a *strong likelihood* of injury to Plaintiff.   In other words, Plaintiff has not shown that any defendant acted with deliberate indifference, making his Complaint subject to dismissal for failure to state a claim for violation of his Eighth Amendment rights.

In his response, Plaintiff merely reiterates his original argument: "Plaintiff was stabbed multiple times by another resident with a known history of unprovoked violence, including prior stabbings.  Prison officials were aware of this resident's history and failed to take reasonable steps to protect Plaintiff, such as separating or transferring that resident per IMPP 20-105A."  (Doc. 20, at 1.)  Plaintiff claims that Warden Schnurr "permitted a practice of downgrading and mischaracterizing such incidents, instead of accurately classifying these incidents as 'assaults' with 'dangerous contraband' or 'deadly weapon', facility officials routinely downplayed them to lesser disciplinary categories such as 'fight' or 'battery'."  (Doc. 22, at 1.)  Plaintiff includes no support for this assertion or any explanation for why officials would want to do this.  Plaintiff has

not shown that officials should have concluded that Slater presented "a strong likelihood of injury, not a mere possibility." *Turner,* 804 F. App'x at 926.

The Supreme Court has warned that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979) (citations omitted). "The opinion of a prison administrator on how to maintain internal security carries great weight and the courts should not 'substitute their judgment for that of officials who have made a considered choice.'" *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 754 (10th Cir. 2014) (quoting *Whitley v. Albers,* 475 U.S. 312, 321–22 (1986)). Particularly in light of the deference owed to HCF officials, the Court finds that Plaintiff has failed to state a constitutional claim for failure to protect.

## IV. Conclusion

Plaintiff has failed to show good cause why his AC should not be dismissed for the reasons discussed above and in the MOSC.

**IT IS THEREFORE ORDERED BY THE COURT** that this matter is **dismissed** for failure to state a claim upon which relief may be granted.

**IT IS SO ORDERED**.

**Dated December 15, 2025, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**